IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:09-CR-0028 (01) |
| | § | |
| SAMUEL FELIX | § | |

## REPORT AND RECOMMENDATION
## TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE and
## MOTION TO SUPPRESS STATEMENTS

Came for consideration the motion to suppress filed May 12, 2009 by defendant SAMUEL FELIX. By this motion, defendant FELIX seeks to suppress evidence obtained during a search of the vehicle he was driving after it was stopped for a traffic violation. Also before the Court is the motion to suppress statements filed by defendant on May 14, 2009 wherein defendant seeks to suppress any statements made by defendant after his arrest. The Court conducted an evidentiary hearing on defendant's motions on May 19, 2009. The government filed a supplemental brief in opposition to defendant's motions on May 21, 2009. Upon consideration of the evidence presented at the hearing, the pleadings, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motions to suppress should be DENIED.

I.
THE INITIAL TRAFFIC STOP

*A. The Facts Giving Rise to the Stop*

On the afternoon of March 20, 2008, Texas Department of Public Safety (DPS) Trooper Ben

Dollar was traveling westbound on I-40 in Carson County, Texas in a marked vehicle.[1] The Trooper observed a silver passenger car traveling eastbound. Trooper Dollar testified he was unable to determine if the occupants of the car were complying with the seat belt law due to the reclined positions of their seats. The Trooper crossed the highway median to further investigate and pursued the vehicle eastbound without activating his emergency lights and without initiating a stop. The passenger car had California license plates and was traveling in the right-hand lane.

While both the silver passenger car and Trooper Dollar's patrol car were traveling eastbound (the Trooper was behind the passenger car), they passed another DPS trooper conducting an unrelated traffic stop on the right-hand shoulder of the highway. Trooper Dollar, who was traveling in the left-hand lane, observed the passenger car remain in the right-hand lane as it passed by the traffic stop even though the left-hand lane next to it was not occupied by another motorist. Trooper Dollar testified he utilized his radar and a pacing method to determine the passenger car did not reduce its speed to twenty miles per hour below the posted speed limit as it passed by the stationary patrol car, which had its emergency lights activated and was clearly being used in conducting a traffic stop. The trooper directed his vehicle into the right-hand lane, pulled up behind the silver passenger vehicle, and activated his overhead lights to initiate a traffic stop for a violation of Texas Transportation Code 545.157, a statute regulating the passing of an authorized emergency vehicle.[2]

---

[1] The factual background is merely a summarization of the evidence presented at the evidentiary hearing and is not intended to be a complete, verbatim recitation of the evidence. If the parties believe a more exhaustive version of the evidence is necessary for a determination of this motion, they shall order a transcript of the hearing and file such with the Court.

[2] As relevant here, section 545.157 provides:

(a) On approaching a stationary authorized emergency vehicle using visual signals that meet the requirements of Sections 547.305 and 547.702, an operator, unless otherwise directed by a police officer, shall:

    (1) vacate the lane closest to the emergency vehicle when driving on a highway with two or more lanes traveling in the direction of the emergency vehicle; or

    (2) slow to a speed not to exceed:

*B. The Legality of the Traffic Stop*

A routine traffic stop is analyzed under the guidelines set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Shabazz*, 993 F.2d 431, 434-35 (5th Cir. 1993). Under *Terry*, the court must determine the reasonableness of the search or seizure by asking (1) whether the officer's action was justified at its inception and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878. As established by the Supreme Court in *Whren v. United States*, the temporary detention of a motorist who the police have probable cause to believe has committed a traffic violation is reasonable under the Fourth Amendment. 517 U.S. 806, 819, 116 S. Ct. 1769, 1777, 135 L. Ed. 2d 89 (1996).

When considering the facts and circumstance of a stop, the court must "give[] due regard to the experience and training of the law enforcement officers" and "allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750-51, 151 L. Ed. 2d 740 (2002)). Any evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981).

As reflected by the video, the silver vehicle (driven by defendant FELIX) approached a

---

    (A)  20 miles per hour less than the posted speed limit when the posted speed limit is 25 miles per hour or more.

(b)  A violation of this section is:
    (1)  a misdemeanor punishable under Section 542.401.

stationary authorized emergency vehicle with visual signals activated and did not vacate the lane closest to the emergency vehicle on a highway with two or more lanes. Based on Trooper Dollar's testimony as to the speed of the vehicle when it passed the traffic stop and testimony that the vehicle did not slow to a speed twenty miles per hour less than the posted speed limit, the driver (defendant FELIX) committed a violation of the traffic laws of Texas. *See* TEX. TRANSP. CODE ANN. § 545.157 (Vernon Supp. 2008). Since the trooper witnessed this violation of Texas law, he had probable cause to stop the vehicle. *See Whren*, 517 U.S. at 819, 116 S. Ct. at 1777. The initial stop was justified.[3] *See id.*

## II.
## WAS THE DETENTION PROLONGED

*A. The Facts Giving Rise to the Detention*

After making the traffic stop, Trooper Dollar approached the vehicle on the passenger side, explained the transportation code violation, and asked the driver for a driver's license and proof of insurance. The passenger immediately advised the trooper that the driver (defendant FELIX) could not speak English and that she (the passenger) spoke on his behalf. She indicated the driver did not have a driver's license. The trooper asked for some type of identification from the driver and asked the passenger if the car belonged to her. The passenger advised the car belonged to a friend of the driver named Bernabe. Trooper Dollar then asked the driver to exit the car and stand next to the patrol car while he spoke to the passenger. The driver (defendant FELIX) immediately complied.

In response to the trooper's questions, the passenger identified the driver as Samuel Felix, her

---

[3] Defendant argues Trooper Dollar's initial pursuit of defendant's vehicle was a result of the trooper profiling a vehicle with California license plates with Hispanic occupants. As the stop of the vehicle for the commission of a traffic violation was proper, the factors that drew the trooper's attention to the vehicle in the first place are irrelevant to this Court's determination as to whether evidence discovered after the valid stop should be suppressed. This statement does not constitute a finding that any racial profiling did occur.

husband, and produced her driver's license and an identification card for defendant FELIX.  When queried about having a different last name than defendant and wearing no wedding ring, the passenger stated, "Well, we might as well be married," explaining she had been with defendant for six years.  In response to additional questioning by the trooper, the passenger advised she and the defendant were headed to Frankford, Missouri from California in search of work in a factory, but did not know what kind of factory work.  The passenger provided the trooper with proof of insurance but the insurance was not in the name Bernabe (whom she had identified as the vehicle's owner).  The passenger then obtained the registration papers and, reviewing them as she handed them to the trooper, again identified the owner of the car as Bernabe.  In response to further questioning, the passenger advised they were staying with friends in Missouri and would be there about two weeks.  The passenger's retrieval of the identifications, insurance and registration papers, and questioning by the trooper lasted approximately two and one-half minutes.

      The trooper testified that while speaking with the passenger he observed the passenger exhibit, based upon his training, signs of extreme nervousness (her hands and arms shook, she avoided eye contact, and she developed red blotches on her neck) and that the passenger's nervousness did not subside as the stop continued.  The trooper also testified he believed the passenger's responses to his questions were intentionally vague and, through his training and experience, stated he was aware it is a common practice of drug couriers to be left a vehicle with only the ignition key, registration papers, and proof of insurance.

      After being provided with the identifications and necessary registration and insurance papers, the trooper returned to his patrol car.  Upon the trooper's request, defendant seated himself in the front passenger side of the trooper's patrol car. Approximately three minutes into the stop, Trooper Dollar entered the patrol car and began to input information regarding the stopped individuals and vehicle

into the patrol car's computer. As he was inputting the required information into the computer system, Trooper Dollar attempted to question defendant FELIX but was unable to do so because of the language barrier. Trooper Dollar radioed a nearby Spanish-speaking officer, Trooper Oscar Esqueda, who was the officer executing the traffic stop referenced earlier which resulted in defendant's violation of the transportation code. Approximately four minutes later, or seven and one-half minutes into the stop, Trooper Esqueda arrived to assist in communicating with the defendant.

Defendant FELIX was seated in the front passenger side of the patrol car and Trooper Esqueda stood next to the patrol car speaking to defendant FELIX through the front passenger window. While Trooper Dollar was waiting on computer responses, Officer Esqueda talked with defendant FELIX in Spanish concerning the nature of his trip, defendant's relationship with the passenger, the ownership of the car, how defendant obtained the car, and the defendant's, the passenger's, and the car owner's cities of origin.

Defendant informed Trooper Esqueda that he was traveling to Missouri from California because he had friends there would could possibly get him a job as a lumberjack. He states he and his wife were planning on staying there if his job hunt was successful. He said he was borrowing the car from a friend named Bernabe Leon. According to defendant, he and his wife had traveled to Missouri before and briefly stayed at a hotel there before leaving because they did not have an address for the person they were going to see. As defendant was conversing with Trooper Esqueda, Trooper Dollar noticed that the defendant frequently paused before answering Trooper Esqueda's questions, avoided eye contact, was constantly itching his arms and legs, was sweating despite the car's air conditioner being on, and had an increased pulse, as evidenced by his carotid artery visibly pulsing in his neck. Trooper Dollar testified that defendant's extreme nervousness was, in his training and experience, very evident.

When the computer checks returned and the warning ticket printed, Trooper Dollar handed all of the paperwork and identification card to defendant FELIX. Approximately eleven and one-half minutes had elapsed from the trooper's initial contact with the defendant and passenger in the stopped vehicle until the trooper issued defendant FELIX his warning and returned his documents to him. Approximately twelve minutes elapsed from the trooper's initial contact with the passengers until Trooper Esqueda explained in Spanish the warning to defendant and how to avoid future violations.

After Trooper Esqueda explained the warning and confirmed, in response to defendant FELIX's inquiry, that it would not go on defendant's record, defendant FELIX replied, "I'm in the process of arranging and well. . . . " At that point, Trooper Dollar spoke to Trooper Esqueda about his concerns regarding the discrepancies between the two stories and the nervousness exhibited by both of the car's occupants. Trooper Esqueda then asked the defendant if he was carrying anything illegal. Defendant replied, "No." Trooper Esqueda made the same inquiry with examples of illegal items and defendant replied, "No." Trooper Esqueda asked defendant if he was carrying any money and defendant explained, "Just what's necessary for the road." Trooper Esqueda then asked if the troopers could search the car and everything in it and defendant replied, "If you want. Check everything out." Trooper Esqueda's questioning lasted approximately fifteen seconds before the defendant consented to the search.

### B. The Legality of the Roadside Detention

A detention may last no longer than required to effect the purpose of the stop. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *United States v. Brigham*, 382 F.3d at 507). If all computer checks come back clear, then as a general matter reasonable suspicion disappears and there is no legitimate reason for extending the stop. *See id*. at 431. "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and

before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id*. Importantly, as the *Brigham* court established: "There is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *Brigham*, 382 F. 3d at 511 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)).

In this case, the detention itself was initially prolonged as a result of the driver not possessing a driver's license or other identification, a language barrier necessitating Trooper Esqueda's presence, and the need to clarify ownership of the vehicle and resolve any discrepancies between the registration papers and the proof of insurance. The purpose of the traffic stop, however, was not complete as to defendant FELIX until the warning citation and documents were returned to him, the requirements of the transportation code explained to him, and the significance of a warning explained to him. The undersigned finds there was not an unreasonably prolonged detention as a result of intentional acts of the troopers <u>prior to</u> the conclusion of the traffic stop.

Further, the undersigned does not find an unreasonably prolonged detention <u>after</u> the conclusion of the traffic stop. Immediately upon concluding the traffic stop as to defendant FELIX by explaining the significance of the warning to defendant, Trooper Esqueda asked the series of questions concerning whether defendant had anything illegal, was carrying money and if the troopers could search the car and everything inside the car. This series of questions lasted only fifteen seconds. To the extent, if any, defendant argues the few seconds during which the trooper asked him this series of questions before he (the defendant) gave consent to a search of the vehicle was a prolonged detention which rendered any subsequent consent invalid, such argument is without merit. To find otherwise

would be to utilize the type of "constitutional stopwatch" expressly disapproved by *Brigham*. Trooper Esqueda asked defendant for consent to search the vehicle within seconds after the return of defendant's documents, advising him of the actions required by the transportation statute, and explaining the significance of a warning. The undersigned does not find an unconstitutionally prolonged detention occurred in this case after the conclusion of the traffic stop and prior to the defendant giving consent to search. The Court finds the brief, fifteen second, encounter with Trooper Esqueda was consensual.

Even if the few seconds after the conclusion of the traffic stop and prior to defendant's consent were found to constitute a prolonged detention, the undersigned finds enough reasonable suspicion was present to support these few seconds of questioning prior to asking defendant for consent to search the vehicle. During the course of the valid traffic stop, Trooper Dollar observed both the driver and the passenger exhibiting what he had been trained to recognize as signs of extreme nervousness. The passengers had related what, in both troopers' experience, was an unlikely story concerning their trip. The versions of the trip's justification did not match, and neither could give any details surrounding their plans. While the passenger claimed to be the driver's wife, she had a different last name from the driver and showed no physical indicia she was married. The name the passenger gave as the owner of the vehicle did not match the insurance, and the insurance and registration papers on the car did not match. In addition, the trooper had noticed there was only a single key in the ignition which, in his experience, is unusual with a typical motorist. Through his training and experience, however, it is common to find only a single key in instances where a car is left for a courier to pick up to transport illegal items. Pillows and blankets in the backseat reinforced the trooper's suspicions that the occupants were attempting to make a non-stop long distance trip. Finally, defendant had advised that the car's owner was from Sinaloa, an area Trooper Esqueda knew from his experience and

training was the location of a large Mexican drug cartel.  Considering the totality of the circumstances, and giving due deference to Trooper Dollar's and Trooper Esqueda's specialized drug interdiction training as we must, the troopers' continued detention of defendant FELIX, if in fact it was a continued detention and not a consensual encounter, did not violate the Fourth Amendment.  *See Cortez*, 449 U.S. at 418, 101 S. Ct. at 695.

These interrelated factors, along with the officers' training for drug interdiction, provided reasonable suspicion defendant was engaged in trafficking something illegal and justified the few seconds of additional questioning after the conclusion of the stop and prior to obtaining consent to search.  The undersigned finds (1) no prolonged detention occurred in this case after the conclusion of the traffic stop, and (2) alternatively, if there was a continued detention of a few seconds after the conclusion of the traffic stop and prior to the defendant giving consent to search, it was justified by reasonable suspicion.

### III.
### CONSENT

Defendant FELIX verbally consented to a search of his vehicle but now contends his consent was "involuntary and the product of an unreasonable detention."  (Defendant's Motion to Suppress Evidence and Incorporated Memorandum of Law, pg. 10).  Defendant's claim that he was subjected to an unreasonable detention has been addressed above and found to be without merit.  As to defendant's claim that his consent was not voluntary, that claim is now addressed.

The undersigned initially notes that the police do not need reasonable suspicion or any other basis to request consent.  *See United States v. Drayton*, 536 U.S.194, 201, 122 S. Ct. 2105, 2110, 153 L. Ed. 2d 242 (2002) (holding that law enforcement officers may ask for consent to search even if they have no basis for suspecting the individual of criminal wrongdoing, as long the officers do not induce

cooperation by coercive means). To be valid, consent to search must be knowingly and voluntarily given, and free from any coercion, as evaluated under the totality of the circumstances. *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993); *United States v. Tedford*, 875 F.2d 446, 451 (5th Cir. 1989). To determine whether consent was voluntarily given, this Court must consider (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000). The government bears the burden of proving consent was voluntary. *Kelley*, 981 F.2d at 1470.

　　1.　　<u>Custodial status</u>.

The defendant had not been arrested nor handcuffed at the time he gave consent. The defendant had been given the traffic warning, had the significance of a warning explained to him, had been advised how to avoid another violation, and had, in his possession, the returned identifications, registration, and insurance papers. The defendant knew he was only receiving a warning and had no reason to believe he would be further detained. The only remaining act was to exit the patrol car and return to his vehicle. Defendant FELIX argues Trooper Esqueda was still positioned at the front passenger side window. However, there has been no evidence offered that defendant FELIX felt he was being detained as a result of Trooper Esqueda's position, which was not unreasonable under the circumstances, *i.e.*, the need to converse with the defendant in Spanish. At the time defendant gave consent to search the vehicle, his custodial status was minimal and was no more onerous than necessary to complete the traffic stop. This factor weighs in favor of the government.

　　2.　　<u>Coercive police procedures</u>.

The troopers did not raise their voices with defendant, nor did they threaten him in any way.

Case 2:09-cr-00028-J-BB   Document 40   Filed 05/22/09   Page 12 of 19   PageID 149

Instead, the officers were polite throughout the entire encounter. There were no intentional coercive police procedures utilized. The defendant experienced only the temporary detention resulting from a normal traffic stop. Being placed in the patrol car for the safety of the officers is not unusual. Further, the presence of the officers on each side of defendant for communication purposes was necessary due to defendant's inability to understand or speak English. Although these two factors have been identified by the defendant as intimidating, they certainly were not sufficient or onerous enough to be coercive. This factor weighs in favor of the government.

3. <u>Defendant's cooperation</u>.

Defendant complied with each request made by the troopers during the encounter, and freely provided information in response to questioning. Defendant was cooperative throughout the stop, did not demonstrate hostility or attempt to frustrate the investigation. Further, in response to the request for consent to search the vehicle, defendant not only consented but stated the troopers could "check everything out." This factor weighs in favor of the government.

4. <u>Awareness of right to refuse consent</u>.

There was no testimony concerning whether defendant did or did not know, at the time he gave consent, that he could refuse consent, limit consent, or withdraw consent. There is no evidence the defendant's consent to search the vehicle was solely a result of his belief that he could not refuse a search. Defendant, however, was a Mexican national migrant worker who had only been in the United States since 2000. The troopers did not utilize a consent form advising defendant of his right to refuse, nor did the troopers verbally advise defendant of his right to refuse consent. Trooper Esqueda did, however, ask for consent by asking "may" we search your car which, as the government argues, could indicate defendant had a right to refuse. Although it is arguably very close, this factor
M:\CRIM\R&R\FELIX-28.CONSENT&STMTS:2                 12

weighs in favor of the defendant.

     5.     The defendant's education and intelligence.

Although the defendant had a limited formal educational level and is a Mexican national migrant worker, there was no evidence the defendant's intelligence was diminished or impaired in any manner. The defendant was able to converse intelligently with Trooper Esqueda. This factor weighs in favor of the government.

     6.     The defendant's belief no incriminating evidence will be found.

Great effort was taken to conceal the illegal narcotics in the engine area of the car, inside a void area in the car's frame rails. It is reasonable to conclude defendant believed no incriminating evidence would be found. This factor weighs in favor of the government.

The undersigned finds the factors above support a finding that defendant's consent was voluntary. The trooper requested consent at the time of the completion of the stop, *i.e.*, almost immediately upon issuance of the warning citation and explanation thereof. Defendant had at all times been cooperative and seemed to understand and be able to communicate in Spanish with Trooper Esqueda.

As noted above, the consent in this case was provided almost contemporaneously with the completion of the traffic stop, therefore, the consent was not given during any illegal detention. Further, the Court has found reasonable suspicion existed to support any detention for any minor time periods prior to the completion of the traffic stop and after the completion of the traffic stop. As the consent was not given during an illegal detention, the Court is not required to make any further determination as to whether the consent was an independent act of free will so as to determine if there is a break in the causal chain between a constitutional violation and the consent. *See United States v.*

*Jenson*, 462 F.3d 399, 407 (5th Cir. 2006).

## IV.
## ARREST

Defendant also contends his arrest was not justified. (Defendant's Motion to Suppress Evidence and Incorporated Memorandum of Law, pg. 7). After defendant consented to a search, the troopers instructed defendant and his passenger to stand to the side of the patrol car. Trooper Esqueda testified a cursory inspection of the front bumper area of the vehicle showed signs of its repeated removal. Trooper Esqueda testified that after raising the hood of the vehicle and utilizing his flashlight, he observed black plastic wrapped in tape through an empty bolt hole of the frame rail in an area which should have been a void space. Based on this observation and based on his training and experience that this type of packaging and area of concealment was consistent with smuggling narcotics, the troopers placed defendant FELIX and the passenger under arrest and Trooper Esqueda advised them of their *Miranda* rights in Spanish. Both defendant and his passenger indicated they understood their rights. The troopers transported defendant and his passenger to the nearest DPS office, and arranged for transport of the vehicle. The vehicle was subsequently inspected at the DPS office where access to the interior of the frame rails revealed four bundles containing a substance later identified as methamphetamine.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 594, 160 L. Ed. 2d 537 (2004). Whether there is probable cause depends on the totality of facts and circumstances within an officer's knowledge at the moment of arrest and whether those are "sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Nunez-Sanchez,* 478 F.3d 663, 666 (5th Cir. 2007) (internal quotation omitted). The officer's knowledge need only "establish

that there was a fair probability that a crime occurred." *Id.* at 666-67 (internal quotation omitted).

The search of the vehicle in this case was conducted pursuant to a valid consent. During the search, Trooper Esqueda, with the aid of his flashlight, observed plastic wrapped in black tape in an area which should have been a void space. This in and of itself was sufficient for a reasonable person to conclude defendant and his passenger were transporting concealed contraband, and taking great effort to hide the item. Further, considering the totality of the facts and circumstances, including those set forth below, there was more than sufficient probable cause to conclude defendant and his passenger were committing illegal narcotics trafficking in violation of state or federal law. *See Nunez-Sanchez,* 478 F.3d at 666.

1. A bumper indicating repeated removals and the training and experience to know the bumper area is a common area for smuggling contraband;

2. Training and experience that contraband is often concealed in the engine area of a car in black materials so as to obscure detection;

3. The trooper's knowledge of the mechanics of a car to know the importance of a vehicle's frame rails and that the area where the black plastic was observed is designed as a void area;

4. A single key in the ignition on an air-freshener key chain and the training and experience that single keys are commonly left in cars prepped for couriers transporting illegal substances;

5. The driver's lack of a driver's license;

6. Driving a third-party vehicle, one that does not belong to either the driver or passenger, cross country with insurance purchased by another unknown party and the training and experience that such an arrangement is common in contraband smuggling;

7. What appeared to the troopers to be indicators of extreme nervousness as to both defendant and his passenger that did not diminish as the stop proceeded;

8. Perceived inconsistencies between the statements of defendant FELIX and the

       passenger regarding the length of the trip;[5]

9. The passenger's tendency to answer the trooper's questions in the tone of a question and vaguely, as if not sure of her answers;

10. The fact that the passenger did not know specifics about the type of factory in which she and defendant FELIX were driving cross county to obtain work;

11. The defendant's pausing before answering the trooper's questions, as well as stuttering;

12. Loose food wrappers and drink containers, and blankets and pillows, in the vehicle, indicative of non-stop travel;

13. Driving cross country for potential, but not certain, employment.[6]

Under the totality of the facts and circumstances of this case, the undersigned finds probable cause to arrest defendant existed. *See Devenpeck*, 543 U.S. at 152, 125 S. Ct. at 594.

## V.
## STATEMENTS

In his motion to suppress statements, defendant contends any statements made subsequent to his arrest were not voluntary because:

1. defendant was not presented before a judge as soon as practicable;

2. defendant was not afforded a lawyer prior to and during interrogation;

3. defendant was subjected to coercive interrogation; and

4. any statements made by defendant were made under duress.

Defendant FELIX argues his statements were made without the officers apprising him of his

---

[5] Both defendant and the passenger indicated they would stay to look for employment for two weeks. Defendant's comment that if they found a job they "might stay" did not necessarily indicate different statements regarding the length of the trip, rather, it could also be interpreted that if they found employment they would retrieve their possessions and family and "stay" in the area. However, on its face, it was an inconsistent statement.

[6] Any one of these circumstances, taken individually, would not appear to create probable cause to support the arrest of defendant and his passenger. However, when taken in combination with the trooper's viewing of the black plastic in an area that should have been void and which is a known area for concealing illegal items in trafficking, these circumstances constituted facts sufficient to create adequate probable cause.

constitutional rights *prior to* interrogation. Lastly, defendant FELIX maintains he did not waive his right to remain silent, right to counsel, or right to have counsel appointed.

The test for determining the voluntariness of statements is whether, under the totality of the circumstances, the accused "made an independent and informed choice of his own free will . . . his will not having been overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (5th Cir. 1985). To this end, police officers must inform a person who they have arrested of his or her *Miranda* rights. "Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444, 120 S. Ct. 2326, 2336, 147 L. Ed. 2d 405 (2000) (quoting *Berkemer v. McCarty*, 468 U.Sl. 420, 433, n. 20, 104 S. Ct. 3138, 3138, 82 L. Ed. 2d 317 (1984)). Moreover, a suspect's Fourth Amendment rights are not violated simply because he fails to explicitly waive his *Miranda* rights. *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009). By choosing to answer officers' questions after being read his *Miranda* rights, a suspect demonstrates his intent to forfeit those rights, even if he does not explicitly waive them. *Id.*

In this case, at the time of the roadside arrest, defendant FELIX was advised of his *Miranda* rights in Spanish. Defendant was not re-advised of his rights prior to beginning an interrogation at the local DPS headquarters; however, defendant was re-apprised of his rights during the interrogation, and shortly after it began.[7] Defendant did not give any incriminating statements with regard to the offense charged prior to re-apprisal of rights.

The undersigned finds defendant was timely advised of his rights on two occasions, but did

---

[7]Testimony was offered that the beginning of the interview was for purposes of obtaining personal history about the defendant.

not invoke either his right to remain silent or his right to counsel. To solicit a waiver of *Miranda* rights, the law does not require a police officer to use a waiver form or to ask explicitly whether the defendant intends to waive his rights. *See Hearn*, 563 F.3d at 104. Neither a written nor an oral express waiver is required, even though implied waivers are disfavored. *United States v. Hernandez*, 574 F.2d 1362, 1371 (5th Cir. 1978); *but see North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S. Ct. 1755, 1759, 60 L. Ed. 2d 286 (1979) (observing, "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case."). Where an officer confirms that a person in a custodial interrogation setting understands his rights, such confirmation is sufficient to establish that person's knowledge of his rights. *Hearn*, 563 F.3d at 104; *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000).

      Here, the defendant was read his rights and then the defendant himself read his warning of constitutional rights aloud and acknowledged he understood his rights. A defendant's subsequent willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver. *Id*. Again, defendant FELIX did not invoke his rights as evidenced by the fact that he did not request counsel and engaged in answering the officer's questions. Defendant has not demonstrated any statements he made were involuntary. Defendant has failed to show his interrogation was riddled with coercion sufficient to overcome his free will, nor has he demonstrated he was under such duress that his statements were involuntary. Defendant's motion to suppress statements should be DENIED.

## VI.
## RECOMMENDATION

      It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the motion to suppress filed by defendant SAMUEL FELIX as to all evidence

discovered in the search of his vehicle be DENIED, and that the motion to suppress all statements made subsequent to his arrest filed by defendant be DENIED.

## VII.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to forward a copy of this Report and Recommendation to defense counsel and to the Assistant United States Attorney by the most expedient means available.

IT IS SO RECOMMENDED.

ENTERED this 22nd day of May 2009.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to this Report and Recommendation. *See* 28 U.S.C. § 636. This case was originally set for trial on May 26, 2009. However, the district court has granted defendant's motion for a continuance, and the trial is now set for June 1, 2009. Therefore, all objections must be filed by **12:00 p.m. (noon) on Wednesday, May 27, 2009.** Any such objections shall be in writing and shall specifically identify the portions of the findings, conclusions, or recommendation to which objection is made, and set out fully the basis for each objection. Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on the Magistrate Judge and all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions set forth in this report and accepted by the district court. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).